Damien M. Schiff, Cal. Bar No. 235101*
Luke A. Wake, Cal. Bar No. 264647*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
DSchiff@pacificlegal.org
LWake@pacificlegal.org

Isaiah H. McKinney, Tex. Bar No. 24120412*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
IMcKinney@pacificlegal.org

*Pro Hac Vice Pending*

*Attorneys for Plaintiffs*
*Iliamna Natives Ltd. and*
*Alaska Peninsula Corp.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ILIAMNA NATIVES LTD. and ALASKA PENINSULA CORP., | Case No. 3:24-cv-00132 |
| Plaintiffs, | |
| v. | |
| ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in his official capacity as Administrator of the Environmental Protection Agency; BRUNO PIGOT, in his official capacity as Environmental Protection Agency's Acting Assistant Administrator for Water, | |
| Defendants. | |

**COMPLAINT**
**(5 U.S.C. §§ 702, 706)**

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 702, 706.

2.      The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202, and to vacate unlawful agency action under 5 U.S.C. § 706.

3.      Venue is proper under 28 U.S.C. § 1391(e)(1)(C) because Defendants are an agency and officers of the United States, Plaintiffs reside within the District of Alaska, and this action does not involve real property within the meaning of the federal venue statute. *See also* 5 U.S.C. § 703 (venue for actions under the Administrative Procedure Act is generally proper in "a court of competent jurisdiction").

**INTRODUCTION**

4.      The Clean Water Act ("CWA") provides a comprehensive permitting regime for the United States Army Corps of Engineers ("Corps") to authorize projects involving the discharge of dredged and fill material into navigable waters. But after setting out standards to govern such permitting, Congress authorized the Environmental Protection Agency ("EPA") to take an end-run around the permitting review process. In so doing, Congress

unconstitutionally delegated to EPA the authority to override the CWA's permitting process virtually whenever the EPA Administrator deems fit.

5. EPA has now asserted its "veto power" to kill a mining project in Bristol Bay at the Pebble deposit, which is the largest gold- and copper-ore deposit in the world. If EPA had not exercised its unbounded discretion to veto the project, mine development would have continued.

6. Pebble Limited Partnership ("Pebble LP") has been working to develop a mine at the Pebble deposit since the 2000s. Plaintiffs Iliamna Natives Limited and Alaska Peninsula Corporation (collectively, the "Native Corporations") have provided logistical services, land leases, and baseline environmental studies to Pebble LP, and will continue to provide significant infrastructure if Pebble LP is permitted to move forward with its mining plans. This work has provided and will provide jobs for hundreds of the Native Corporations' Alaska Native shareholders.

7. Pebble LP applied to the Corps for a permit under CWA Section 404(a) to use waters within the Bristol Bay watershed as disposal sites for dredged and fill material as part of its mine development. But while the application was pending before the Corps, EPA exercised its authority under CWA Section 404(c) to veto this project because it determined that the project would result in an "unacceptable adverse effect" on certain salmon fisheries and habitat within the Bristol Bay watershed. The Corps then denied Pebble

LP's permit application, explaining that no waters were available for a disposal site after EPA's veto.

8. Congress has given no guidance in Section 404(c) or anywhere else in the CWA to limit or guide EPA's discretion in deciding what constitutes an "unacceptable adverse effect" that would warrant EPA's veto or, more fundamentally, whether or when a project with an "unacceptable adverse effect" should be vetoed.

9. EPA's veto has jeopardized Pebble LP's plan to develop a mine at the Pebble deposit. And without the mine, the Native Corporations will lose hundreds of millions of dollars in business with Pebble LP. The contracts with Pebble LP have brought economic stability back to a dying region. Members of the Native villages had left for jobs elsewhere, but since Pebble LP started developing the mine, these members returned to the region for good-paying jobs on Pebble LP projects. After the EPA veto, these jobs vanished.

10. EPA's 2023 Final Determination prohibiting and restricting the use of Bristol Bay waters as disposal sites under Section 404(c) is an exercise of unconstitutionally delegated authority and is therefore unlawful.

## PARTIES

### Plaintiffs

11. Iliamna Natives Limited ("Iliamna Natives") and Alaska Peninsula Corporation ("APC") are Alaska Native Village corporations within

the meaning of the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1629h ("ANCSA"). Under ANCSA, the Native Corporations were deeded landholdings near the Pebble deposit, which location the Native Corporations chose for its natural resources.

12.   Iliamna Natives' shareholders are members of the Native Village of Iliamna, Alaska ("Iliamna Village"). Iliamna is about 17 miles from the Pebble mining site, and Iliamna Natives' land base totals about 69,000 acres.

13.   Iliamna Natives provides much-needed services to Pebble LP, including transportation, fuel, camping, waste management, and land leasing. Iliamna Natives also has contracts with Pebble LP to build infrastructure for mine development.

14.   APC is the consolidated Village Corporation composed of five Alaska Native Village Corporations—Port Heiden (Meshik), South Naknek (Qinuyang), Newhalen, Kokhanok, and Ugashik. APC's ANCSA land base consists of 400,000 acres, including approximately 200,000 acres in the Iliamna Lake area around the Native Villages of Newhalen and Kokhanok. Roughly 90,000 acres of land in the Iliamna Lake region are adjacent to the Pebble project, and the land near Newhalen is only a few miles away. APC has over 1,000 shareholders.

15.   Since the mid-2000s, APC has provided services to Pebble LP, including hydrologic consulting, land leases, camping and logistic services,

bear guards, environmental studies, land use, and medical support. APC has also contracted with Pebble LP to build significant infrastructure.

16. Iliamna Natives' and APC's contracts with Pebble LP for current and future work are dependent on Pebble LP developing a mine at the Pebble deposit.

## Defendants

17. EPA is an agency of the United States government established pursuant to Reorganization Plan No. 3 of 1970, 84 Stat. 2086. It is the agency primarily responsible for administering the CWA and is responsible for vetoing Pebble LP's permit under Section 404(c).

18. Michael S. Regan is the Administrator of EPA and oversees EPA's enforcement of the CWA. He is sued in his official capacity only.

19. Bruno Pigott is EPA's Acting Assistant Administrator for Water. Mr. Pigot's predecessor signed the veto decision that is challenged in this action. Mr. Pigot is sued in his official capacity only.

## LEGAL BACKGROUND

20. Under the CWA, the Corps, with supervision from EPA, administers provisions pertaining to the discharge of dredged and fill material into regulated "navigable waters." *See* 33 U.S.C. §§ 1344(a)–(b), 1362(7).

21.    Under Section 404(b) of the CWA, the Corps designates disposal sites for dredged or fill material, using guidelines established by EPA. *Id.* § 1344(b).

22.    Under Section 404(c) of the CWA, EPA may veto any area as a potential disposal site for dredged or fill material if EPA determines that the anticipated dredge-and-fill activity "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *Id.* § 1344(c).

23.    Congress did not provide any direction or guidance to EPA for determining when a project will cause an "unacceptable adverse effect," or for deciding whether any project producing such an effect should be prohibited. As the Ninth Circuit held in *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 753 (9th Cir. 2021), Section 404(c) "grant[ed] unfettered discretion to the Administrator."

## FACTUAL ALLEGATIONS

24.    Prospectors and trappers, including APC shareholders from Newhalen, discovered gold in the late 1970s and early 1980s at the Pebble deposit. One of the largest deposits of gold-, copper-, and molybdenum-bearing ore and minerals, the Pebble deposit is located at the headwaters of the North Fork Koktuli River ("NFK watershed"), South Fork Koktuli River ("SFK watershed"), and Upper Talarik Creek ("UTC watershed") (collectively the

"Bristol Bay watershed"). Researchers estimate that the deposit contains about 11 billion tons of metal-laden ore.

25.     The deposit covers an area of approximately six square miles. Measured from its center, the deposit is about 19 miles northwest of Iliamna Village and about 18 miles northwest of Newhalen. Running through the deposit is the Upper Talarik Creek, which is an APC land holding and drains onto APC lands near Newhalen.

26.     Cominco Alaska, of Cominco Ltd. (now Teck Resources Ltd.), staked a claim to the deposit in 1987 and added claims in 1988. Cominco explored the deposit until 1997. Northern Dynasty Minerals Ltd. ("Northern Dynasty") purchased the rights to the claim in 2001.

27.     As alleged above, the Native Corporations have contracted with Northern Dynasty's subsidiary, Pebble LP, to provide essential logistical services and build infrastructure for the development of the Pebble mine.

### *Agency Proceedings*

28.     For Northern Dynasty to develop a mine at the Pebble deposit, it is necessary, and standard mining practice, for the company to obtain a disposal site for dredged and fill material. As such, in 2004, Northern Dynasty began the process of applying for a CWA Section 404 permit from the Corps to use some bodies of water in the SFK and NFK watersheds as disposal sites. *See Final Determination of the U.S. Environmental Protection Agency*

*Pursuant to Section 404(c) of the Clean Water Act Pebble Deposit Area, Southwest Alaska*, 2-8–9. (Jan. 2023) ("Final Determination").

29.    During the 2000s, Pebble LP and Northern Dynasty performed numerous environmental studies of the area around the Pebble deposit, discussed ways to limit environmental harms with multiple federal and state agencies, and drafted environmental plans that included significant mitigation measures. Pebble LP spent almost $200 million on environmental studies and plans.

30.    As Pebble LP performed environmental studies, activist groups and other opponents of the mine petitioned EPA to ban the project; they urged EPA to exercise its discretion under Section 404(c) to veto any plans to dispose of dredged and fill material in the Bristol Bay watershed. *Id.* at 2-9. Thereafter, EPA, without notifying Pebble LP, initiated its own study of the impacts of the Pebble mine project.

31.    In 2014, EPA issued a Proposed Determination under Section 404(c) to restrict Pebble LP from using most waters in the SFK, NFK, and UTC watersheds as disposal sites for dredged and fill material. *Id.* at 2-13. At this point, EPA had not reviewed any proposal from Pebble LP to develop a mine, as Pebble LP was still preparing its permit application. EPA only considered the potential impacts of a *hypothetical* mine—not the project that Pebble LP was planning.

32.     Pebble LP challenged the 2014 Proposed Determination in this Court, which preliminarily enjoined EPA from continuing the Section 404(c) process. *See* Final Determination, 2-14. In May 2017, under a new presidential administration, Pebble LP and EPA settled, and the Court dismissed the case. *See id*. As part of the settlement agreement, EPA agreed to withdraw the 2014 Proposed Determination. *Id*.

33.     In 2017, Pebble LP submitted a Section 404 permit application to the Corps' Alaska District to discharge dredged and fill material in only the NFK and SFK watersheds. In June 2020, Pebble LP filed a revised permit application (2020 Mine Plan) with updated data and analysis. The Corps then issued its final environmental impact statement, which found only minimal environmental impacts. *See, e.g., Pebble Project Environmental Impact Statement*, Army Corps of Engineers, 4.24-1 (July 2020) (explaining that the proposed Pebble mine "is not expected to have a measurable impact on fish populations").

34.     Despite these findings, in November 2020, the Corps' Alaska District denied the permit application because of unfounded views that Pebble LP's proposed mine would cause significant environmental harm.

35.     Pebble LP administratively appealed the permit denial immediately. On appeal, the Corps' appellate review officer determined that the appeal had merit in part. As such, the review officer remanded the

permitting decision to the Corps' Alaska District for further analysis. *See Administrative Appeal Decision Clean Water Act, Pebble Limited Partnership,* POA-2017-00271 (Alaska Dist. Apr. 24, 2023).

36. Meanwhile, environmental and recreational groups challenged EPA's withdrawal of the 2014 Proposed Determination in this Court, but this Court dismissed their lawsuit. *See Pirzadeh*, 1 F.4th at 749–50. On appeal, the Ninth Circuit held that, although EPA has unfettered discretion under CWA Section 404(c) to decide whether to veto a project, the agency's regulations (as opposed to the statutory text) sufficiently constrain that discretion to make a challenge to a veto withdrawal judicially reviewable. The Ninth Circuit therefore remanded the case to this Court. *See id.* at 752–53, 758–60.

37. By then, yet another presidential administration had entered office, and EPA toggled its position yet again. In September 2021, EPA requested that this Court vacate EPA's withdrawal of the 2014 Proposed Determination. The Court granted the motion, and EPA continued the Section 404(c) review process, ultimately issuing the 2023 Final Determination to preemptively block any development of the Pebble LP mine.

38. In the Final Determination, EPA restricted and prohibited the use of waters in the Bristol Bay watershed because EPA feared that the proposed mining project would "have unacceptable adverse effects on anadromous fishery areas in the SFK, NFK, and UTC watersheds." Final Determination,

at 7-1. Specifically, EPA was concerned that the mine would permanently fill 8.5 miles of fish streams, as well as 91 miles of streams and 2,100 acres of wetlands that support fish streams. *Id.* Absent, however, from EPA's discussion were the facts that there are over 33,000 miles of streams within the Bristol Bay watersheds, and the Corps had determined that the mine would not measurably affect fish populations. *See Pebble Project Environmental Impact Statement*, 4.24-1; Final Determination, 3-6.

39.    The Final Determination "prohibits" the use of many waters in the NFK and SFK watersheds as disposal sites for discharging dredged and fill material while operating and developing a mine according to the 2020 Mine Plan. It also prohibits using these same waters as disposal sites in any future proposals to develop mines at the Pebble deposit that would have the same level of environmental impact on those waters as the 2020 Mine Plan. 88 Fed. Reg. 7441, 7443 (Feb. 3, 2024).

40.    The Final Determination also "restricts" the use of most waters in the NFK, SFK, and UTC watersheds as disposal sites in any future mine proposals if those proposals would have the same level of environmental impact on the NFK, SFK, and UTC watersheds as the 2020 Mine Plan. 88 Fed. Reg. at 7443.

41.    In April 2024, the Corps denied Pebble LP's permit application without prejudice because EPA's veto prohibited Pebble LP from using those

waters in the NFK, SFK, and UTC watersheds: "[B]ecause the mine site falls within the EPA's Defined Area of Prohibition and Defined Area of Restriction, the EPA's determination is a controlling factor that cannot be changed by a [Corps] decision maker and the application is hereby denied without prejudice." U.S. Army Corps of Engineers, Alaska District, *Record of Decision: Review of the Application by Pebble Limited Partnership (POA-2017-00271) in Light of the Prohibitions and Restrictions Imposed by the* Final Determination of the U.S. Environmental Protection Agency, at 7 (Apr. 15, 2024).

42.     If not for EPA's Final Determination, the Corps would fully consider Pebble LP's application according to the Corps review officer's directions in the April 2023 Administrative Appeal Decision. And even if the Corps fully reviewed Pebble's application and ultimately denied Pebble LP's permit application, Pebble LP could seek a permit to use other waters, such as waters in the UTC watershed, as a disposal site. But under the Final Determination, EPA restricts Pebble LP, along with any other future mining operation, from using waters in the NFK, SFK, *and* UTC watersheds as disposal sites for a mine at the Pebble deposit.

43.     Under EPA's Final Determination, Pebble LP is permanently prohibited from developing a mine at the Pebble deposit.

## Injuries to Iliamna Natives and APC

44.     Iliamna Natives and APC each own lands located near the Pebble deposit, and both have provided Pebble LP with much-needed services as Pebble LP studied and prepared the mine site. The Native Corporations each have significant contracts for future services and have granted Pebble significant land-use rights for access during development and operation of the proposed mine.

45.     Prior to Pebble LP researching and developing near the Pebble deposit, the Native Corporations had struggled for decades to establish and maintain a prosperous economy. Without work, many of their shareholders left the region for jobs elsewhere. But in the 2000s, as Pebble LP performed environmental studies, Iliamna Natives and APC shareholders began providing logistics services for Pebble LP, including environmental studies, medical service, bear guard services, camping and medical services, transportation, and land leases.

46.     The State of Alaska owns and operates an airport in Iliamna, and this airport has served as an entry point for Pebble LP to bring in supplies and employees. As such, Iliamna has become a transportation hub at the proposed mine site.

47.     APC, with funding from Pebble LP, started a consulting firm, APC Services, which provided scientific studies including hydrology and bathology

consulting for Pebble LP. APC Services grew quickly, employing many APC shareholders. APC shareholders returned to the region to work on Pebble LP-contracted projects. Newhalen and Kokhanok schools, which had been on the brink of closing before Pebble LP started researching at the Pebble deposit, were thriving with full classrooms.

48.     Along with providing consulting and logistical services, the Native Corporations have contracts to build and maintain infrastructure for the burgeoning worksite at the Pebble deposit.

49.     Iliamna Natives and its subsidiaries have provided Pebble LP with exploration services, including land development and leases in Iliamna, helicopter logistics, camp services for as many as 200 people per day, communications and community engagement, contract labor for drilling operations, equipment rentals, local passenger transportation, and office and hangar space for Pebble LP's operations. Iliamna Natives also entered into a Right of Way (ROW) Agreement to provide access to the Lake for the road corridor contemplated by Pebble LP's mining plan. The Agreement included future opportunities for contracts within the boundaries of Iliamna Natives, including the airport, joint venture opportunities to provide power to the mine, and possible operations opportunities on the proposed marine corridor route.

50.     APC has contracts with Pebble, including a long-term ROW Agreement that permits Pebble to reserve, construct, and operate a private

road across APC lands from the mine to public lands, as well as barge landing areas, and port infrastructure. As part of the ROW agreement, Pebble will make annual toll payments to APC and pay other fees prior to and during project construction and operation. The ROW agreement also assigns APC 'Preferred Contractor' status at Pebble, which provides APC a preferential opportunity to bid on Pebble-related contracts located on APC lands.

51.     But these contracts are contingent upon Pebble LP developing a mine at the Pebble deposit. If Pebble LP cannot obtain the necessary permits, the contracts will be terminated. Therefore, absent judicial relief, EPA's prohibition and restriction on using Bristol Bay waters for dredged and fill disposal sites will cause enormous economic harm and devastating social disruption to the Village Corporations.

52.     The Native Corporations and their shareholders recognize that the mine can be developed and operated in a way that respects and protects the environment and their Indigenous culture *and* provides economic opportunities. As APC's late chairman said: "If the mine causes the death of one fish, that is one fish too many." The Native Corporations are working closely with Pebble LP to ensure that the environment is protected throughout development and the Native Corporations can continue work on their contracts with Pebble LP.

53. During EPA's Section 404(c) review process, EPA was required by law to meaningfully consult with the Native Corporations, as well as with Alaska Native Corporations and tribes who opposed the mine. Although EPA met with the Native Corporations, EPA did not heed their concerns regarding impacts to local economies should they lose their lucrative contracts with Pebble LP if the Pebble project were vetoed. Nor did EPA listen to how the Native Corporations were working with Pebble LP to protect the Bristol Bay watershed. Instead, EPA prioritized the environmental concerns of Alaska Native tribes and corporations located over 100 miles away from the Pebble deposit that opposed the mine.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

54. All preceding paragraphs are incorporated herein by reference.

55. Each Plaintiff is harmed by EPA's 2023 Final Determination.

56. The 2023 Final Determination will prevent Pebble LP from developing a mine at the Pebble deposit. Iliamna Natives and APC have lucrative contracts with, and provide services for, Pebble LP, which they will be unable to perform if Pebble LP cannot develop and operate a mine at the deposit.

57. A decision declaring Section 404(c) an unconstitutional delegation of legislative power to EPA and enjoining enforcement of the 2023 Final Decision would allow Pebble LP to continue to pursue a Section 404 permit

which, if granted, would allow Plaintiffs to continue performing their contracts with Pebble LP. Even if the Section 404 permit application were ultimately denied and the denial was upheld upon judicial review, Pebble LP could—absent EPA's veto—file another application for a permit to fill waters other than the ones listed in the 2020 Mine Plan, and, if that were granted, the Native Corporations could continue performing their contracts.

58.    The Native Corporations have no plain, speedy, and adequate remedy at law for their injuries. Money damages are not available in this case.

59.    This case is currently justiciable because the 2023 Final Determination went into effect on February 3, 2023, 88 Fed. Reg. 7441.

## CLAIM FOR RELIEF

### The Final Determination Is Void Because the Section 404(c) Veto Authority Violates the Separation of Powers
### (U.S. Const. art. I, § 1, and 5 U.S.C. § 706(2)(B))

60.    The preceding paragraphs are incorporated herein by reference.

61.    The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

62.    The United States Constitution vests all lawmaking powers in Congress, including the power to regulate the channels of commerce, such as "navigable waters" which are the subject of the Clean Water Act. The Constitution prohibits Congress from delegating away lawmaking authority.

63. When deciding if a delegation is constitutional, courts examine whether a statute provides an "intelligible principle to which the . . . body authorized to act is directed to conform." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). A statute must "sufficiently guide[] executive discretion to accord with Article I." *Gundy v. United States*, 588 U.S. 128, 136 (2019).

64. Section 404(c) provides, in relevant part, that EPA "is authorized to prohibit the specification . . . of any defined areas as a disposal site . . . whenever [EPA] determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."

65. Section 404(c) gives EPA unbounded authority to veto proposed projects. The statute never defines "unacceptable adverse effect": the term could apply to environmental effects, health effects, economic effects, or even moral effects. There is no intelligible principle guiding EPA on what makes an effect "adverse" or "unacceptable." Instead, EPA has complete discretion to make the policy decision of deciding which effects are unacceptably adverse.

66. Not only does Section 404(c) give EPA unbounded authority to decide what is an "unacceptable adverse effect," Section 404(c) grants EPA "unfettered discretion" to choose whether to issue a veto, even when EPA

determines that a project would cause an "unacceptable adverse impact." *Pirzadeh*, 1 F.4th at 752–53 ("Nothing in the statute constrains the Administrator's discretion to initiate . . . or, ultimately, to decline to invoke his or her § 404(c) authority. . . . The statute grants unfettered discretion to the Administrator to make those decisions." (footnote & citation omitted)).

67.    EPA cannot save Section 404(c) by limiting the definition of "unacceptable adverse impact" or its own veto discretion via regulation, such as 40 C.F.R. § 231.2(e). An agency cannot save a statute from violating the nondelegation doctrine by limiting the authority the agency itself exercises: "The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory." *Whitman*, 531 U.S. at 472–73. Even if EPA's interpretation of "unacceptable adverse effect" in 40 C.F.R. § 231.2(e) as an "impact . . . which is likely to result in significant degradation . . . or significant loss of or damage" actually provided limits on the delegation, EPA cannot avoid violating the Constitution by limiting its own authority. Congress unconstitutionally delegated authority, and EPA cannot save the delegation by imposing self-constraints.

# PRAYER FOR RELIEF

Plaintiffs Iliamna Natives and APC respectfully request that this Court enter a judgment in their favor granting the following relief:

1.      A declaration that CWA Section 404(c) is unconstitutional because it delegates legislative authority to an executive agency;

2.      A declaration that the Final Determination is contrary to constitutional right, power, privilege, or immunity, because it relies on an unconstitutional grant of legislative authority;

3.      An injunction prohibiting EPA from enforcing Section 404(c);

4.      An order setting aside and vacating the Final Determination;

5.      An award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, or any other applicable authority; and

6.      Any other relief the Court deems just and proper.

DATED: June 24, 2024.

<div style="margin-left:40%">

Respectfully submitted,

DAMIEN M. SCHIFF*
LUKE A. WAKE*
ISAIAH H. McKINNEY*

</div>

*Pro Hac Vice Pending          By___/s/ Damien M. Schiff_____
                               DAMIEN M. SCHIFF, *Pro Hac Vice*
                               Cal. Bar No. 235101

                               *Attorneys for Plaintiffs*
                               *Iliamna Natives Ltd. and*
                               *Alaska Peninsula Corp.*